IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

MICHELLE PRESCOTT,                    )
                                      )
    on behalf of herself and          )
    others similarly situated,        )
                                      )
            Plaintiff,                 )        Civil Action No. 2:09-cv-00322-DBH
                                      )
    v.                                 )
                                      )
THE PRUDENTIAL INSURANCE               )
COMPANY OF AMERICA,                    )
                                      )
            Defendant.                 )
_____)

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR
CERTIFICATION OF COLLECTIVE ACTION AND TO AUTHORIZE AND FACILITATE
NOTICE TO ELIGIBLE OPT-INS**

Robert P. Riordan
Brett E. Coburn
Alston & Bird LLP
1201 West Peachtree Street
Atlanta, GA 30309-3424
Tel: (404) 881-7000

James R. Erwin
Pierce Atwood LLP
One Monument Square
Portland, ME 04101
jerwin@pierceatwood.com
Tel:  (207) 791-1100

Counsel for Defendant

TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................ 1

II.   STATEMENT OF FACTS ................................................................................... 2

      A.    Prudential's Disability Claims Operations.............................................2

      B.    The Job Duties of DCMs and DC Techs ...............................................4

      C.    The Flexible Work Day .........................................................................5

      D.    Workplace Metrics and Deadlines ........................................................6

      E.    Prudential's Timekeeping Policies and Practices ..................................7

      F.    Prudential's Policy and Practices Regarding Additional Work
            Hours....................................................................................................8

      G.    Prudential's History With Payment For Extra Hours Worked ...............9

      H.    Deviations From Accepted Practice......................................................10

III.  ARGUMENT AND CITATION OF AUTHORITY ......................................... 11

      A.    Collective Action Certification is Available Only in Appropriate
            Cases Where Putative Class Members are Similarly Situated and
            Efficiencies Can Be Achieved ..............................................................11

      B.    The Court Should Apply a Heightened Standard in Analyzing
            Plaintiff's Request for Collective Action Certification ........................12

      C.    Prescott Cannot Demonstrate That the Putative Class Members Are
            Similarly Situated as Required..............................................................16

            1.    Plaintiff Has Not Shown an Unlawful Common Policy or
                  Practice.....................................................................................16

                  a.    Plaintiff Has Failed to Identify a Unlawful Common
                        Policy ............................................................................17

                  b.    Plaintiff Has Failed in Her Attempts to Establish an
                        Unlawful Common Practice.............................................18

                        i.    The "pressure cooker" argument is factually
                              and legally deficient...........................................19

ii.    The "look the other way" argument is fatally flawed................................................................................21

2.    The Ultimate Disposition of Claims Will Require Analysis of Circumstances That Are Unique to Each Putative Class Member ...........................................................................................23

3.    Prescott's Attempt to Include Disability Claims Technicians in the Putative Class Further Undermines Her Bid for Collective Action Certification...................................................27

D.    Plaintiff Has Failed to Demonstrate Sufficient Interest From Putative Class Members............................................................28

IV.    CONCLUSION......................................................................................... 30

## I.   INTRODUCTION

Plaintiff Michelle Prescott ("Plaintiff" or "Prescott") asks this Court to certify a collective action against Defendant The Prudential Insurance Company of America, Inc. ("Prudential") comprised of hundreds of current and former employees who have worked over a period of as many as six years in different locations with different job titles, duties, schedules, supervisors and varying work circumstances.  Prescott admits that to prevail in her certification request, she must establish an unlawful policy or practice common to the putative class, but she has completely failed to meet this burden.  She also admits that Prudential at all relevant times maintained a lawful, generally known and observed policy regarding the reporting of and payment for extra hours worked.  This policy has resulted in Prudential's payment of hundreds of thousands of dollars of additional wages to putative class members.  If there were deviations from this lawful policy, they resulted from highly individualized circumstances – not a widespread unlawful policy or practice.  That is why Prescott can only offer in support of her motion a string of individual vignettes specific to individual employees and individual supervisors that allegedly occurred at sporadic points in time.  These vignettes underscore the fact that a jury trial of the putative class members' claims would necessarily turn on individualized evidence of each work day and work week of each employee, not on common proof as required for certification.  For these and other reasons as set forth below, class certification should be denied.

II.     STATEMENT OF FACTS

A.     Prudential's Disability Claims Operations.

Prudential's Group Insurance Division develops, markets, and provides short-term and long-term disability insurance products to institutional clients.  (Simmons Dec. at ¶ 2)[1]  This includes processing the disability claims of its clients' employees, which consists of receiving claims, reviewing the terms of the related disability insurance policies, assessing information received from claimants, obtaining and analyzing medical information, and making decisions about a claimant's eligibility for benefits.  (Anderson Dep. at 25; Prescott Dep. at 47-48)  The claim processors work at sites located in Portland, Maine and Roseland, New Jersey.  (Simmons Dec. at ¶ 2; Halton Dep. at 67-69)

Prudential uses numerous disability "teams" to accomplish its work.  (Anderson Dec. at ¶ 2; Jefferson Dep. at 29-30, 40-41)  At present, there are 14 teams spread across the company's Maine and New Jersey locations.  (Simmons Dec. at ¶4)  Teams are generally dedicated to short-term claims or long-term claims, and may be comprised of a Team Manager, one or more Team Leads,[2] a Disability Claims Specialist, one or more Disability Claims Technicians ("DC Techs"),

---

[1] The declarations and depositions cited herein are contained in the Appendix of Exhibits in Support of Prudential's Response in Opposition to Plaintiff's Motion for Certification of Collective Action and to Authorize and Facilitate Notice to Eligible Opt-Ins (the "Appendix"). In addition to depositions taken during discovery and declarations of certain corporate personnel and defense counsel, Prudential has submitted 53 declarations from DCMs. While a number of declarations were taken by Prudential at the outset of the case, Prudential could not determine which subset of these declarations it would rely upon to oppose Plaintiff's motion until the motion was filed and Plaintiff's arguments revealed. That subset is now submitted in support of Prudential's arguments. For the Court's convenience and ease of reference, Prudential has compiled a Digest of the declarations designed to facilitate their review, as more fully explained in the Appendix itself. References to the Digest herein will be listed as "Digest at __."

[2] Team Leads are first level managers who supervise all team members except for the Team Manager. (Anderson Dec. at ¶ 2; Danforth Dep. at 17) They have substantial discretion to determine how to ensure that the work of their individual teams is accomplished. (*Id.* at ¶ 6)

Disability Claims Managers II ("DCM IIs"), Disability Claims Managers I ("DCM Is"), and healthcare professionals, including doctors and nurses.  (Jefferson Dep. at 27; Danforth Dep. at 77; Anderson Dec. at ¶ 4)  There is also a separately managed Family and Medical Leave ("FML") team that also may evaluate short-term disability claims if a claimant also seeks leave under the Family and Medical Leave Act.  (Brown Dep. at 88, 132; Simmons Dec. at ¶ 3)  Of the positions mentioned, Prudential classifies and pays the DCM Is and DCM IIs (collectively, "DCMs") as non-exempt employees under the Fair Labor Standards Act (the "FLSA").[3] (Simmons Dec. at ¶ 10)  Prudential pays other members of the disability team as exempt employees.  (Danforth 30(b)(6) Dep. at 17; Jefferson Dep. at 54)

Plaintiff seeks to represent DCMs and DC Techs[4] who worked in Maine or New Jersey over the past six or three years, respectively.[5]  Currently, there are 45 DCMs working in disability claims positions in Maine.  (Simmons Dec. at ¶ 5)  They are part of four long-term disability teams and one short-term disability team, each of which is led by a Team Manager with one or two Team Leads dedicated to a particular team.  (*Id*. at ¶ 4)  In New Jersey, Prudential employs 94 DCMs in disability claims positions at present.  (*Id*. at ¶ 5)  They are part of six long-term teams and three short-term teams, each of which is led by a Team Manager with

---

[3] While Prudential chooses to pay its DCMs on a non-exempt basis, Prudential could classify DCMs as exempt if it chose to do so.  Indeed, Prudential's competitor companies classify the analogous positions in their workplaces as exempt.  (Carpenter Dep. at 98; Conley Dep. at 18; Simmons Dec. at ¶ 8)

[4] As addressed in more detail below, Prudential maintains that DC Techs, exempt employees not included within the ambit of the claims set forth in the Complaint, do not fall within the scope of the putative class.

[5] Prescott also seeks to represent FML examiners who operate under a different management structure.  Many FML examiners do not have any responsibility for considering and determining disability claims; some, on the other hand, make short-term disability benefits decisions only in tandem with determining leave eligibility under the Family and Medical Leave Act.  (Brown Dep. at 91)

LEGAL02/31828095v15

one or two Team Leads dedicated to a particular team.  (*Id*. at ¶ 4)  There are currently 19 Team

Leads working in the disability claims area in New Jersey and eight in Maine.  (*Id*.)  Considering

all persons who have worked in the DCM position over the approximate class period, the number

of putative class members exceeds 225.  (*Id*. at ¶ 5)  That number would grow considerably were

DC Techs included in the class.

B.     The Job Duties of DCMs and DC Techs.

       DCMs review and evaluate a claim as submitted, collect and assess additional

information from the claimant; obtain and analyze medical and other information related to a

claim (often with input from a physician or nurse); review and interpret policy language that

establishes requirements for a claim to be payable; and determine whether to approve or deny the

claim.  (Anderson Dep. at 25; Prescott Dep. at 47-48)  DCMs have authority to approve claims

up to a certain benefit amount per month without authorization from a more senior team member.

(Ordway Dep. at 81; Jefferson Dep. at 45-46; Anderson Dec. at ¶ 5)  For example, a DCM I may

approve a long-term claim up to $1,500.00 per month, and a DCM II may approve a long-term

claim up to $2,500.00 per month.  (Anderson Dec. at ¶ 5, Exhibit "A")  If a DCM makes a

determination that a claimant should receive a monthly benefit that exceeds the DCM's authority

limits, the DCM must take that determination to a Team Lead or Team Manager for review.

(Danforth 30(b)(6) Dep. at 45-46; Anderson Dec. at ¶ 5)  Protocols in the short-term area are

similar.  (Carpenter Dep. at 117; Anderson Dec. at ¶ 5)

       New hires without significant experience often begin work as a DCM I after training.

(Simmons Dec. at ¶ 2)  More experienced employees work as DCM IIs.  (*Id*.; Jefferson Dep. at

43-44)  While each may handle non-complex claims, DCM IIs typically handle more difficult

claims.  (Anderson Dec. at ¶ 3)  DC Techs are generally the most experienced claims examiners

- 4 -

and work on the most complex claims.[6]  (Anderson Dep. at 29; Danforth 30(b)(6) Dep. at 184-185; Anderson Dec. at ¶ 3)  Their approval authority regarding monthly long-term benefits is $4,000.00.   (Anderson Dec. at ¶ 5 and Ex. A)  In addition to determining claims, DC Techs mentor DCMs, which includes dedicated coaching of newly hired DCMs after completion of training,[7] and help Team Leads assess and manage workload.  (Jefferson Dep. at 77-78; Danforth 30(b)(6) Dep. at 50-51, 162; Anderson Dec. at ¶ 3)  DC Techs also participate in projects including, but not limited to, "best practices" teams. (Danforth 30(b)(6) Dep. at 161-162; Anderson Dec. at ¶ 3)

C.     The Flexible Work Day.

DCMs enjoy a great degree of flexibility regarding their work schedule.[8]  (Digest at C; Halton Dep. 118-119; Conley Dep. at 42-43 ; Lashua Dep. at 20-21; Anderson Dec. at ¶ 9) There are certain "core" hours that a DCM must be "on duty" in order to be available to

---

[6] Prescott erroneously claims that "[t]he job descriptions of DCM-I's, DCM-II's, and DCT's are virtually identical."  (Pl. Br. at 6)  The DC Tech job description provides, however, that, in addition to the differences between DC Techs and DCMs discussed below, DC Techs also "may conduct quality audits of the work of other claims examiners," and thus exercise some level of oversight over the work of DCMs.  (See Ex. D3 to Pl. Cert. Motion)  Of course, the differences in reality (on the job) go beyond what appears in the job descriptions.  Further, Prescott's assertion that the "core competency" models applied to DCMs and DC Techs are "virtually identical" (Pl. Br. at 8), ignores the additional emphasis that the DC Tech "core competency" model places on leadership and strategic thinking.  (See Ex. D4 to Pl. Motion)

[7] Both of Prescott's contentions that "there…isn't any meaningful difference between the job responsibilities and duties of DCM's and DCTs," and that Prudential Vice President Cliff Jefferson could identify the potential for leadership as the only difference between DC Techs and DCMs are simply wrong.  (Pl. Br. at 8)  In fact, in his deposition, Jefferson enumerated two specific and important differences between the positions: (1) that DC Techs mentor and facilitate the growth of DCMs; and (2) that DC Techs have a higher level of sign-off authority.  (See Jefferson Dep. at 45-46)

[8] While DCMs enjoy a lot of flexibility in developing a schedule, once a schedule is determined, DCMs must adhere to it absent occasional disruptions from doctor's appointments and other similar sporadic personal commitments. (Conley Dep. at 46-48; Ordway 30-31; Anderson Dec. at ¶ 9; Simmons Dec. at ¶ 6)

Prudential's clients, generally a four or five hour period. (Halton Dep. at 119; Simmons Dec. at ¶ 6) Otherwise, DCMs may start work early in the day and leave early, or backload their hours towards the end of the day. (Conley Dep. at 66, 72; Simmons Dec. at ¶ 6; Anderson Dec. at ¶ 9) Some DCMs work entirely from home. (Danforth 30(b)(6) Dep. at 94; Simmons Dec. at ¶ 6) Others work some days at home, and some days in the office. (Digest at B; Danforth 30(b)(6) Dep. at 94-95; Simmons Dec. at ¶ 6) Still others work entirely from the office. (Simmons Dec. at ¶ 6) Those authorized to work from home are provided technology to permit them to access the computer network remotely in order to perform their work. (Lashua Dep. at 79-80) DCMs are provided meal and rest breaks and take those breaks in a variety of different ways. (Digest at G, H; Simmons Dec. at ¶ 7)

D.    Workplace Metrics and Deadlines.

Like any business, the Group Insurance Division must resolve disability claims within certain deadlines. (Jefferson Dep. at 112; Anderson Dec. at ¶ 6) Some of these deadlines are set by applicable law, some arise under the relevant insurance policy, and some are set by internal Prudential policy. (Jefferson Dep. at 112-113; Anderson Dec. at ¶ 6) The work of DCMs varies greatly based on types of claims (short-term versus long-term); varying client-specific policies; different benefit plan time periods; and different levels of claim complexity (as to a single DCM's "claim block," and also from DCM to DCM). (Jefferson Dep. at 59, 112-113, 115-116; Danforth Dep. at 60; Conley Dep. at 99-100; Anderson Dec. at ¶ 7) Thus, a DCM's experience on the job varies daily, and the range of daily experiences among the numerous DCMs is vast. (Jefferson Dep. at 113; Conley Dep. at 127-129; Anderson Dec. at ¶ 7)

Prudential monitors compliance with deadlines in order both to abide its obligations under law and under contract, and to manage the workload to ensure that it meets those

deadlines.  (Jefferson Dep. at 112-114)  To help it manage its workforce, Prudential employs a

variety of measures often referred to as "metrics."  (Danforth 30(b)(6) Dep. at 35; Anderson Dec.

at ¶ 6)  Among other important functions, the review of metrics permits Prudential to balance the

workload among its claims examiners.  (Anderson Dep. at 125-126; Anderson Dec. at ¶ 8)   In

the event a particular claims examiner appears to be struggling, claims can be moved from that

person's "claim block" to another claims examiner capable of handling the claims at issue.

(Prescott Dep. at 52; Anderson Dec. at ¶ 8)  DCMs are ordinarily able to keep up with their

workload by working their regular 37.5-hour work week.[9]  (Digest at G)  DCMs know that they

may obtain assistance if they fall behind.  (*Id.*)  When claims examiners have persistent

problems, they may be assigned a coach or receive some other form of additional training.

(Anderson Dep. at 85-86, 103; Anderson Dec. at ¶ 8)  Some disability claims examiners simply

fail and leave the company. (Simmons Dec. at ¶ 11)

E.      Prudential's Timekeeping Policies and Practices.

        Prudential uses an "exception based" timekeeping system to capture the hours of its

DCMs.  (Anderson Dep. at 58, 113; Simmons Dec. at ¶ 7)  Each DCM has a pre-determined

regular schedule of 37.5 hours for the work week, and the DCMs are expected to abide their

regular schedules.  (Conley Dep. at 49; Danforth Dep. at 70-71; Simmons Dec. at ¶ 6; Anderson

Dec. at ¶ 9)  In the event DCMs believe they need to deviate from their regular schedules for any

purpose, including attending to personal needs as well as performing additional work, they are

instructed to communicate with their Team Lead in advance.  (Conley Dep. at 46)  DCMs are

well aware of this policy and follow it.  (Digest at C, D, I, K, L, O, P)

---

[9] The claim load at Prudential is generally within, and often lower, than industry standards.
(Hemond Dep. at 93)  DCMs routinely manage their claim blocks within acceptable limits during
their 37.5-hour work week.  (Digest at G)

F.     Prudential's Policy and Practices Regarding Additional Work Hours.

Prudential has a well known and well-observed lawful policy[10] regarding work hours that exceed a DCM's regular schedule.  (Digest at O, P)  The policy is clearly set forth in writing[11] and available on Prudential's intranet, and is well known to DCMs, whether learned from the intranet, orientation, communications from Team Leads and other managers, or otherwise.  (Digest at Q, R, S)  Indeed, even the consent filers in this action admit to some knowledge of the policy, albeit not consistent from one to another.  (*See* Prescott Dep. at 151; Carpenter Dep. at 85-88, 174-75; Ordway Dep. at 31-33; Lashua Dep. at 11-12, 73)

According to Prudential's policy, extra work hours must be raised and approved prior to the work being done.  (Anderson Dep. at 65, 88-89; Anderson Dec. at ¶ 10)  Extra hours can be worked under a variety of circumstances.  (Jefferson Dep. at 102)  During periods when things are particularly busy, there may be blanket approval for a specified number of extra DCM hours to be worked and paid each week.  (Anderson Dep. at 71; Anderson Dec. at ¶ 11)  At other times, and on a more sporadic basis, a Team Lead or Manager may determine that the team is suffering a backlog and may authorize team-wide extra hours on a particular day or during a particular

---

[10] Prescott admits that Prudential's policy regarding payment for extra hours worked is lawful on its face.  (Pl. Br. at 3, 10)  Unfortunately, Prescott then goes on to make an unjustified personal attack on Prudential HR Manager Keri Simmons regarding her knowledge of applicable wage-and-hour law.  (Pl. Br. at 2 n.2)  When questioned in her deposition about her knowledge of the FLSA, Simmons testified that she drew her knowledge about overtime requirements from the Department of Labor's regulations, rather than the FLSA itself.  (Pl. Ex. E11 at 119-20)

[11] The written policy, available on Prudential's intranet site and communicated to employees, is set out at Prescott Dep. at 154-55 and Ex. 1, as well as and Simmons Dep. at 121-22 and Jefferson Dep Ex. 3.  It provides that "All employees in positions that are classified as nonexempt must be paid overtime in accordance with applicable federal, state and local laws.  Prior to working overtime, all nonexempt employees must receive proper prior authorization from management.  Employees must complete and submit overtime documents within the required time frame."

week.  (Anderson Dec. at ¶ 11)  DCMs are not generally *required* to work beyond their 37.5-hour work week in order to reduce a backlog; instead, managers may ask for volunteers to work extra hours (for extra pay, if non-exempt).  (Digest at D, H)  In the event that a single DCM is experiencing a backlog or difficulties keeping up, that DCM may request and receive permission to work extra hours.  (Digest at I; Anderson Dec. at ¶ 10)  Permission to work extra hours may be sought in a variety of ways, including verbally (whether in person or via telephone), by instant message, or by e-mail.[12]  (Digest at K; Simmons Dep. at 121-22)  Permission to work extra hours may be communicated back the same way.  (Anderson Dep. at 93-94)  Once a DCM has worked extra hours, he or she inputs the additional time into the "OT/PT" system, which generates a message to the manager and an alert to review the time entry for payment.  (Anderson Dep. at 94; Jefferson Dep. at 87; Anderson Dec. at ¶ 10)  Provided all is in order, payment is authorized. (*Id*.)  In the event of a deviation or questionable entry, the manager will discuss the issue with the DCM. (Anderson Dec. at ¶ 10)

G.    Prudential's History With Payment For Extra Hours Worked.

        Prudential's policy regarding additional pay for extra hours worked is clear, and Prudential has a long history of making such payments.  Prudential routinely includes in its annual budget additional money to fund compensation for the extra hours the business expects

---

[12] Prescott erroneously claims that Prudential's overtime policy states that an authorization form must be completed in order for an employee to receive approval to work extra time.  (Pl. Br. at 9) Rather, the policy states as follows: "Prior to working overtime, all nonexempt employees must receive proper prior authorization from management.  Employees must complete and submit overtime documents within the required time frame."  (Pl. Ex. G2)  Further, as Keri Simmons explained in her deposition, there is no standard form for obtaining authorization to work overtime, and the required authorization can be obtained in writing, electronically, or verbally. (Simmons Dep. at 121-22)  Regarding the final sentence of the stated policy, Simmons explained that this refers to the procedure by which nonexempt employees record their overtime hours in an electronic online reporting system.  (*Id.* at 124-25)

the DCMs to work in the upcoming year.  (Simmons Dec. at ¶ 8; Anderson Dec. at ¶ 11)  Despite

this forecasting, Prudential often pays out more than the budgeted funds for extra hours worked.

(Simmons Dec. at ¶ 8)  From 2007 through 2009, Prudential paid DCMs more than $524,000 for

work performed beyond their regularly scheduled hours.  (Simmons Dec. at ¶ 8)  Several of the

consent filers in this action who were deposed admit that they inputted their additional hours and

received pay for them, some on a routine and regular basis.[13]  (Lashua Dep. at 45; Prescott Dep.

at 204-05; Carpenter Dep. at 17-19)  In fact, dozens of DCMs have testified that they have not

had any trouble submitting and being paid for extra hours.  (Digest at D, I, K, L)

H.     Deviations From Accepted Practice.

Many DCMs have never worked additional time without reporting and receiving pay for

it.  (Digest at L)  Nevertheless, in any organization as large as Prudential, some deviation from

approved practices may happen.  DCMs at Prudential are generally well-educated and high-

achieving people who take pride in their work.  (Simmons Dec. at ¶ 2; Anderson Dec. at ¶ 12;

*See* Carpenter Dep. at 8-9, 81-82)  While DCMs are not pressured by management to work extra

hours without reporting them,[14] some DCMs have, on occasion, worked extra time without

seeking approval in advance and without letting Prudential know about the additional hours.

(Digest at J, M)  This unreported work time is generally of a *de minimis* nature, and has occurred

on a widely sporadic basis.  (Digest at N)

---

[13] In fact, Prescott and many of the consent filers have been paid a substantial sum for extra hours
worked from 2007 through 2009.  For example, Michael Carpenter received extra pay in the
amount of $10,570.80, and Russell Lashua in the amount of received $8,119.10.  (Simmons Dec.
at ¶ 8)

[14] Prudential maintains multiple channels for DCMs and others to report policy and other
violations, including an anonymous "ethics line" maintained by Prudential's Enterprise Business
Ethics office.  (Simmons Dec. at ¶ 9)  Plaintiff's "suffer in silence" argument is therefore
misplaced.

III.     ARGUMENT AND CITATION OF AUTHORITY

Plaintiff seeks conditional certification of a collective class of all current and former disability claims examiners for Prudential, regardless of specific job title, who have worked in Prudential's offices in Maine since July 22, 2003, or Prudential's offices in New Jersey since July 22, 2006.[15]  This proposed class, not tied to specific job titles or duties, is unacceptably vague and indeterminate, and, moreover, surprising given that Prescott had ample opportunity during discovery to determine job titles and other information about those she purports to represent.  Prescott's argument that DC Techs and all FML examiners should be members of the putative class is factually and legally untenable and underscores the reasons why her motion does not meet the requirements for certification and why it should be denied.[16]

A.     Collective Action Certification is Available Only in Appropriate Cases Where Putative Class Members are Similarly Situated and Efficiencies Can Be Achieved.

The FLSA permits an individual to assert claims on behalf of herself and any "similarly situated" employees, but does not expressly provide for class certification or judicially approved

---

[15] Because the statute of limitations as to any individual class member does not stop running until he or she files a consent to join the lawsuit with the Court, the time frame of any class that is certified should be measured not from the date the lawsuit was filed (July 22, 2009), as Prescott suggests, but rather from the date on which notice is sent to potential class members.

[16] Prescott argues that the six current consent filers should be "formally accepted" as plaintiffs if collective action certification is denied.  (Pl. Br. at 2)  This argument ignores the fact that courts denying collective action certification typically dismiss consent filers without prejudice.  *See*, *e.g.*, *Odem v. Centex Homes*, No. 3:08-CV-1196-L, 2010 WL 424216, at *2 (N.D. Tex. Feb. 4, 2010); *Cameron-Grant v. Maxim Healthcare Servs., Inc.*, 347 F.3d 1240, 1243 n.1 (11th Cir. 2009).  Prescott also makes passing reference to joinder, but she provides no argument in support.  As Prescott admits, the standard for joinder under Fed. R. Civ. P. 20(a) is higher than the standard for collective action certification.  (Pl. Br. at 20-21)  While the only issue currently before the Court is that of collective action certification, if Prescott ultimately puts a true request for joinder before the Court, Prudential reserves the right to respond at that time.

notice to putative class members.  *See* 29 U.S.C. § 216(b).[17]  Collective action certification is

appropriate only where the plaintiff demonstrates that she is similarly situated to the putative

class members, and where collective action treatment would facilitate a court's ability to

efficiently resolve multiple claims in one proceeding.  *See Morisky v. Pub. Serv. Elec. & Gas

Co.*, 111 F. Supp. 2d 493, 499 (D.N.J. 2000) (certification "would be anything but efficient");

*McDonald v. Madison Twp. Bd. of Twp. Trs.*, No. 2:07-cv-0697, 2007 WL 2916397, at *2 (S.D.

Ohio Oct. 5, 2007) (courts should "balance the efficiencies of proceeding either as a collective

action or an individual action, taking the purposes of the FLSA into account in making that

determination").[18]  Collective action certification and the issuance of notice must "be exercised

with discretion and only in appropriate cases."  *Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265,

1268 (M.D. Ala. 2004) (citing *Haynes v. Singer Co.*, 696 F.2d 884, 886 (11th Cir. 1983));

*Camper v. Home Quality Mgmt. Inc.*, 200 F.R.D. 516, 519 (D. Md. 2000) (the relevant inquiry

"is not whether the court has discretion to facilitate notice, but whether this is an appropriate case

in which to exercise that discretion").

> B.   The Court Should Apply a Heightened Standard in Analyzing Plaintiff's Request
> for Collective Action Certification.

Where, as here, the parties have had the opportunity to conduct substantial discovery on

the issue of certification, courts frequently conduct a thorough examination of the record as part

of the certification analysis.  *See*, *e.g.*, *Valcho v. Dallas County Hosp. Dist.*, 574 F. Supp. 2d 618,

---

[17] Nevertheless, district courts "have discretion, in *appropriate* cases, to implement" the FLSA's collective action mechanism "by facilitating notice to potential plaintiffs."  *Hoffman-LaRoche Inc. v. Sperling*, 493 U.S. 165, 169 (1989) (emphasis added).  The *Hoffman* Court instructed that this mechanism should be employed only in cases involving "common issues of law and fact arising from the same alleged…activity," such that resolution of common issues in one proceeding would promote efficiency and judicial economy.  *Id.* at 170.

[18] *See also West v. Border Foods, Inc.*, No. 05-2525 (DWF/RLE), 2006 WL 1892527, at *3 (D. Minn. July 10, 2006) ("'[S]ome identifiable facts or legal nexus must bind the claims so that hearing the cases together promotes judicial efficiency.'").

LEGAL02/31828095v15

622 (N.D. Tex. 2008) ("[B]ecause the court does not intend that its powers be used for a 'frivolous fishing expedition,' it will hesitate to facilitate notice where a plaintiff, having already conducted discovery, still cannot support her claim with evidence."); *Pfohl v. Farmers Ins. Group*, No. CV03-3080 DT (RCX), 2004 WL 554834, at *3 (C.D. Cal. Mar. 1, 2004) (in light of discovery, court could proceed to the second stage of the analysis and weigh the relevant factors to determine similarly situated issue); *Harris v. Fee Transp. Servs., Inc.*, No. Civ.A.3:05CV0077-P, 2006 WL 1994586, at *3 (N.D. Tex. May 15, 2006) ("[T]he similarly situated inquiry is more stringent" given discovery, and "the two-step inquiry collapses into one."); *Rite Aid*, 333 F. Supp. 2d at 1274 ("fairly extensive evidence [of record] on the issue of whether putative class members are similarly situated" permits hard look); *Hinojos v. Home Depot, Inc.*, No. 2:06-cv-00108, 2006 WL 3712944, at *2 (D. Nev. Dec. 1, 2006) (discovery of record reveals no improper common policy); *Ray v. Motel 6 Operating, Ltd. P'ship*, No. 3-95-828, 1996 WL 938231, at *4 (D. Minn. Mar. 18, 1996) ("[F]acts before the Court are extensive, [and] accordingly there is no need for discovery in order to reach a determination.").[19]

Five and a half months of discovery have taken placed here on issues solely relating to collective action certification.  (Riordan Decl. at ¶ 2)  This included exchange of interrogatory responses, production of over 2,300 pages of documents by Prudential, ten depositions of Prudential management employees, the deposition of Plaintiff, and the depositions of four

---

[19] In cases where a plaintiff seeks certification at the outset of a lawsuit, before discovery has taken place, most courts apply a different, "two-tiered" approach to determining whether certification is appropriate.  *Trezvant v. Fidelity Employer Servs. Corp.*, 434 F. Supp. 2d 40, 43 (D. Mass. 2006); *O'Donnell v. Robert Half Int'l, Inc.*, 429 F. Supp. 2d 246, 249 (D. Mass. 2006). At the initial or "notice" stage, a plaintiff must, at a minimum, make a "'modest factual showing' of similar factual and legal characteristics, so that the court is satisfied 'that there is a basis to conclude that questions common to a potential group of plaintiffs would predominate a determination of the merits.'"  *Trezvant*, 434 F. Supp. 2d at 45 (quoting *Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp. 2d 216, 220 (D. Conn. 2003)).

- 13 -

consent filers (with joint deposition exhibits exceeding 100). (*Id.*) The parties sought multiple extensions of the discovery period and sought the assistance of the court on multiple occasions to resolve a number of discovery disputes and scheduling issues. (*Id.*) Given the breadth of the record that has been created and presented relating to collective action certification, Prudential submits that the Court should conduct a rigorous analysis of the parties' evidence and arguments in determining whether Plaintiff has met her burden for conditional certification.

Plaintiff suggests a more relaxed standard that ignores the extent to which discovery has proceeded in this case. (Pl. Br. at 19) Even if the Court were to analyze Plaintiff's request for certification under the first stage of the "two-tiered" methodology often applied when no substantial discovery has taken place, the analysis at the first stage is not a mere formality or an empty standard. Rather, even the first-stage standard must be applied with rigor, calling for Prescott to produce evidence of a common unlawful policy or practice at Prudential. *See Diaz v. Elecs. Boutique of Am., Inc.*, No. 04-CV-0840E(SR), 2005 WL 2654270 (W.D.N.Y. Oct. 17, 2005) (denying first stage conditional certification and considering the nature of plaintiff's claims in ruling on the motion); *West*, 2006 WL 1892527, at *7 (denying certification at "the initial stage of the certification inquiry,").

Prescott argues, however, that, according to case law, she need show only "*substantial allegations* that the putative class members were subject to a single decision, policy, or plan that violated the law." (Pl. Br. at 19, emphasis added). To the contrary, the case law shows that courts have increasingly rejected the "substantial allegations" approach. *See, e.g., Adair v. Wis. Bell, Inc.*, No. 08-C-280, 2008 WL 4224360, at *4 (E.D. Wis. Sept. 11, 2008) (rejecting the "substantial allegations" approach and instructing that the first step in a two-tiered analysis "serves as an important and functional step in the certification process"); *Kronick v. bebe Stores,*

*Inc.*, No. 07-4514(RBK), 2008 WL 4546368, at *2 (D.N.J. Oct. 2, 2008) ("'[The substantial allegations standard] is at best, an inefficient and overbroad application of the opt-in system….").

Regardless of whether the Court conducts a "first-tier" analysis or undertakes a more rigorous review as Prudential submits is due, the Court must still examine the record against the controlling "similarly situated" standard.  The Court need not make conclusive factual or legal determinations, yet it must be cognizant of the factual and legal issues presented by the case in order to inform its decision-making.  As one court put it, even though factual determinations need not be made at the initial stage, "'neither the remedial purposes of the FLSA, nor the interests of judicial economy, would be advanced if [the court] were to overlook facts which generally suggest that a collective action is improper.'"  *Saleen v. Waste Mgmt., Inc.*, No. 08-4959, 2009 WL 1664451, at *4 (D. Minn. June 15, 2009) (quoting *West*, 2006 WL 1892527, at *7); *see also Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 2d 941, 945 (W.D. Ark. 2003) (examining facts because "it would be a waste of the Court's and the litigants' time and resources to notify a large and diverse class only to later determine that the matter should not proceed as a collective action because the class members are not similarly situated"); *Rite Aid*, 333 F. Supp. 2d at 1274 n.4 (examining facts at stage one "because if this court were to allow the case to proceed past stage one of the collective action certification process, the court would have to consider this evidence in revisiting the similarly-situated inquiry on the Defendant's motion to de-certify at stage two"); *Basco v. Wal-Mart Stores, Inc.*, No. 00-3184, 2004 WL 1497709, at *5 (E.D. La. July 2, 2004) ("To create a collective action class…when a Court is convinced that there is insufficient support for same prior to its certification would be an exercise in futility and waste resources for all….").

C.      Prescott Cannot Demonstrate That the Putative Class Members Are Similarly
        Situated as Required.

        1.      Plaintiff Has Not Shown an Unlawful Common Policy or Practice.

Prescott concedes that "the existence of a single policy or practice affecting all of Prudential's disability claims examiners" is "the definitive predicate for the certification of a collective action"  (Pl. Br. at 16) – i.e., a "factual showing sufficient to demonstrate that [she and putative class members] together were victims of a *common policy or plan that violated the law*." *Hoffmann v. Sbarro, Inc.*, 982 F. Supp. 249, 261 (S.D.N.Y. 1997) (emphases added); *see also O'Donnell*, 429 F. Supp. 2d at 250 ("Employees may proceed as a class [under the FLSA] only to the extent they 'were subject to a single decision, policy, or plan that violated the law'") (quoting *Kane v. Gage Merch. Servs., Inc.*, 138 F. Supp. 2d 212, 214 (D. Mass. 2001)).[20]

It is not enough for Prescott to show that she and the putative class members worked in the same job classification and had the same job duties.  *See, e.g.*, *Rite Aid*, 333 F. Supp. 2d at 1270 (commonality regarding basis of claims, rather than job duties, required); *Williams v. Accredited Home Lenders, Inc.*, No. 1:05-CV-1681-TWT, 2006 WL 2085312, at *4 (N.D. Ga. July 25, 2006) ("Liability cannot be determined by considering the employee's job duties" in off-the-clock case).  Nor is it enough simply to show that she and the putative class members have worked unpaid overtime.  *See, e.g.*, *Seever v. Carrols Corp.*, 528 F. Supp. 2d 159, 173-74 (W.D.N.Y. 2007) (denying motion for conditional certification; despite unpaid time, plaintiffs did not provide evidence that any of the violations were part of a company-wide policy); *Castle v. Wells Fargo Fin., Inc.*, No. C 06-4347 SI, 2008 WL 495705, at *2-*5 (N.D. Cal. Feb. 20,

_____

[20] *See also White v. Osmose, Inc.*, 204 F. Supp. 2d 1309, 1314 (M.D. Ala. 2002) (without sufficient evidence that putative class members were victims of an alleged unlawful common policy, "it is doubtful that § 216(b) would further the interests of judicial economy, and it would undoubtedly present a ready opportunity for abuse"); *Morisky*, 111 F. Supp. 2d at 497.

- 16 -

2008) (denying conditional certification; insufficient evidence of a common unlawful policy or plan despite unpaid work).

a.   *Plaintiff Has Failed to Identify a Unlawful Common Policy*.

While Plaintiff readily admits that her motion rests on evidence that a common unlawful policy negatively impacted the putative class members as a group, she has not and cannot identify such a policy, despite extensive discovery.  Rather, she concedes that Prudential has a well known and well followed lawful policy requiring that extra hours worked by DCMs beyond their fixed 37.5-hour work week be authorized in advance and then submitted for payment. Between 2007 and 2009, Prudential paid more than $524,000 in gap time[21] and overtime wages to DCMs pursuant to this policy.  (Simmons Dec. at ¶ 8)  Even the consent filers admit that they submitted for and received pay for gap time and overtime pursuant to the policy.  (Lashua Dep. at 45; Prescott Dep. at 204-05; Carpenter Dep. at 17-19; Simmons Dec. at ¶ 8)  Clearly, this policy, lawful on its face and in practice, cannot serve as a basis for collective action certification, and this is the only policy that Prescott has identified.  For this reason her motion for class certification should be denied.

To the extent there may have been deviations from Prudential's lawful policy, they are not sufficient to support Prescott's motion.  Rather, the existence of an established lawful policy governing payment for all hours worked compels the conclusion that any deviations are failures to abide by Prudential's policy and not a common unlawful policy amenable to collective action treatment. *See Williams*, 2006 WL 2085312, at *3-*4; *see also Burch v. Qwest Commc'ns Int'l,*

---

[21] "Gap time" are those hours between 37.5 and 40 (inclusive), where only a straight time as opposed to overtime payment obligation is at issue.  In addition to their normal compensation for their 37.5-hour workweek, DCMs are in fact paid at their regular hourly rate for all extra time worked between 37.5 and 40 in a week, and they are paid at one-and-a-half times their regular hourly rate for all hours worked over 40 in a week.  (Digest at D)

- 17 -

*Inc.*, 500 F. Supp. 2d 1181, 1188 (D. Minn. 2007) ("The existence of a written policy dictating overtime pay is one factor weighing against conditional certification"); *Epps v. Oak Street Mortgage LLC*, No. 5:04-CV-46-OC-10GRJ, 2006 WL 1460273, at *7 (M.D. Fla. May 22, 2006) (decertifying collective class because of individualized nature of claims, citing the fact that each of the named and opt-in plaintiffs received overtime pay during at least one pay period).

> b.    *Plaintiff Has Failed in Her Attempts to Establish an Unlawful Common Practice.*

Prescott argues that, despite this written lawful policy, there was "unlawfulness in the air." Relying upon isolated vignettes offered by the few who have filed conditional consents, she asks the Court to conclude that these vignettes somehow show a uniform unlawful practice of common application across the entire putative class over the course of several years. Prescott's argument fails to recognize her "proof" for what it is, and ignores the factual reality of record.

There simply is no evidence of a true system-wide mandate to push DCMs to work extra hours and not pay for those hours. There is no evidence of a "top down" edict sent out to the disability teams. Nor is there evidence of any senior management meeting or writing calling for or tolerating uncompensated hours. There is no "smoking gun" memo to the Teams Leads pushing for unpaid work. There is no evidence of a word-of-mouth message sent down through the management ranks. The only "evidence" Prescott can offer is anecdotes of alleged isolated incidents of unpaid work, and the spurious suggestion that "everyone must have known."

On the other hand, Prudential has shown that it had a published lawful policy calling for payment for extra hours, and has supplied evidence of over $500,000 actually paid in the last three years for extra DCM work, including thousands of dollars to consent filers. Prudential has also demonstrated through more than 40 declarations that DCMs know about the lawful policy, and get paid under it. To the extent that some DCMs may not have reported some work on

- 18 -

certain occasions, there is no evidence that the DCMs suffer pressure from management to not report time, and in fact the DCMs deny knowledge by management about such work. The record affirmatively negates any possibility of a uniform unlawful practice affecting DCMs across the board.

Lacking evidence of an actual unlawful practice affecting the entire class, Plaintiff argues that there was a "pressure cooker" environment, and that Prudential management "looked the other way" when DCMs worked extra, unauthorized time.

> i.   The "pressure cooker" argument is factually and legally deficient.

The record evidence negates Plaintiff's assertion of a "pressure cooker" environment that allegedly amounted to an unlawful common practice.[22] Prudential has submitted declarations from more than 40 DCMs who attest that they generally were able to keep up with their work load without working more than 37.5 hours in a week, and that they were able to seek assistance with their workload if needed. (Appendix at G) This testimony, standing alone, shows that the "pressure cooker" case must necessarily turn upon the individual circumstances surrounding a particular DCM, the particular demands of that person's particular job by day, by week, and by month (each year), the ways in which that person dealt with the alleged pressure, and the extent to which that person's supervisor created, knew about, and attempted to control the alleged pressure. Indeed, the testimony of the consent filers only serves to underscore the variability

---

[22] Like many portions of her brief, Prescott's argument in this regard contains entire paragraphs of "fact" without any citation to the record. (*See, e.g.*, Pl. Br. at 11-12) On the rare occasions when she does provide record citations in support of her factual contentions, they are frequently flawed. For example, her discussion of the alleged pressure on DCM II Megan Bernier is based entirely on inadmissible hearsay. (Pl. Br. at 13) Further, her discussion of the alleged pressure on consent filer Janie Reid misstates Reid's affidavit testimony – while Prescott claims that Reid was placed on a "job-termination-threatening performance plan" after she complained about her workload (Pl. Br. at 15), Reid's affidavit states only that she was placed on "performance counseling" and says nothing about a threat to her job. (Ex. F2 to Pl. Cert. Motion, at ¶ 14)

surrounding such facts.  (*See* Lashua Dep. at 43-44; Prescott Dep. at 206-08; Ordway Dep. at 81-82; Carpenter Dep. at 24-26, 83-84)  There is not any uniformity of circumstances or proof surrounding these issues, particularly in light of the abundant evidence of record, set out above, indicating how Prudential management tracks workload, shifts work when a backlog develops, and approves extra work hours when needed.[23]  (Anderson Dec. at ¶¶ 8, 11)

  The existence of these many individualized issues that must be determined, coupled with the very subjective nature of some of these factors (like how a particular DCM senses and deals with pressure on the job), negates the prospect of common proof and demonstrates the absence of a common unlawful practice cutting across the putative class.  Other courts examining similar "pressure cooker" allegations have rejected these arguments for this very reason.  *See*, *e.g.*, *Simmons v. T-Mobile USA, Inc.*, No. Civ. A. H-06-1820, 2007 WL 210008, at *5-*6 (S.D. Tex. Jan. 24, 2007).  In *Simmons*, the court rejected plaintiff's theory that T-Mobile's policies of maximizing sales and minimizing overtime led employees to believe that if they could not meet their quotas during regulars work hours, they must necessarily work uncompensated extra hours. The court denied collective action treatment because individual violations were not evidence of any such common policy or plan, and the case involved many different "low-level supervisors with wide management discretion [who] in practice violate[d] Defendant's clear, lawful written policies…."  *Id.* at *6; s*ee also Basco*, 2004 WL 1497709, at *6-*7 (notwithstanding allegations of budget pressure, off-the-clock claims would still have to be investigated on a case-by-case basis); *West*, 2006 WL 1892527, at *6-*9 (alleged encouragement to work of-the-clock to meet budget did not warrant certification given published written policy requiring payment for

---

[23] Prescott speculates, without citation to the record, that Prudential does not budget for overtime for DCMs.  (Pl. Br. at 11)  The testimony of record shows otherwise – Prudential regularly budgeted for and paid gap time and overtime to DCMs.  (*See* Anderson Dec. at ¶ 11; Simmons Dec. at ¶ 6)

overtime hours); *Smith v. Micron Elecs. Inc.*, No. CV-01-244-S-BLW, 2005 WL 5336571, at *2 (D. Idaho Feb. 4, 2005) (evidence of pressure to work off-the-clock and some supervisor acquiescence does not show that plaintiffs "were subject to a single decision, policy or practice that permitted off-the-clock work.  The Court finds that the evidence of a de facto policy is largely anecdotal.").

        ii.     The "look the other way" argument is fatally flawed.

Prescott further asserts a "look the other way" argument by way of anecdotal testimony from a few consent filers who claim that Prudential management knew or should have known that they were working without compensation.[24]  In contrast to the handful of vignettes Prescott provides in support of her argument, several DCMs have testified that on the occasions when they worked more than 37.5 hours in a week without additional compensation, they did so without their supervisor's knowledge.  (Digest at M)

In any event, class certification is not appropriate even if such isolated "look the other way" contentions were true.  Prescott's argument rests upon the assertion that, on particular days involving particular workloads, particular DCMs, and particular managers, those managers heard or observed something that informed them directly or indirectly that the DCM may be working or intending to work additional hours without authorization or compensation.  Prescott points to such things as an e-mail indicating an intention to perform weekend work, or a comment on the

---

[24] As with her "pressure cooker" argument, Prescott goes on for paragraphs or even entire pages of "facts" about her "look the other way" argument without citation to the record.  (*See* Pl. Br. at 12-16)  When she does provide record citations, she frequently points to entire deposition transcripts with no specified page numbers, which amounts to no citation at all.  (*See*, *e.g.*, Pl. Br. at 13)  Moreover, a number of Plaintiff's other citations are misleading.  For example, Prescott contends that "Prudential's disability claims handlers simply 'were paid for 37 and a half hours per week.  That was their standard pay' even when supervision knew it wasn't accurate.  (Pl. Br. at 16)  In support of this assertion Prescott quotes deposition testimony from her former Team Lead Linda Conley in which Conley is actually explaining why Prescott's pay was not adjusted *down* when Conley suspected that Prescott had not worked a full 37.5-hour week, not whether Prescott was paid for extra time beyond 37.5 hours.  (*See* Conley Dep. at 63)

- 21 -

LEGAL02/31828095v15

way out the door that someone would be working from home that evening.  Indeed, the

depositions of the consent filers underscore the highly individualized nature of the allegations

and evidence the Court and jury would have to examine in addressing Prescott's "look the other

way" argument.  (*See* Prescott Dep. at 166-67, 187, 189, 191, 193; Ordway Dep. at 35-36, 52-53,

55-56); Carpenter Dep. at 24, 109, 131-132)

  For example, Janie Reid admits that, when she asked to work overtime and did work

overtime, she was paid for the extra work.  (Reid Dec. at ¶ 8, Ex. F2 to Pl. Motion)  She claims,

however, that she worked uncompensated hours in order to meet a heavy workload, and testified

that "it is my belief that Prudential supervision and management wants and expects us to work

the additional time to get the work done, but does not want us to tell them…."  (*Id.* at ¶ 9)  In

short, Plaintiff attempts to build her case upon one person's alleged subjective belief about what

another person subjectively wants or expects.  Reid is the only consent filer from New Jersey and

the only witness proffered by Plaintiff who even attempts to describe circumstances there.

Plaintiff's other affidavit witness, Michelle Cobbett, presents similarly deficient testimony.

According to Cobbett, she worked uncompensated hours in order to handle the work load, and

complained about it to her supervisor, who indicated in response that overtime was not available.

(Cobbett Dec. at ¶¶ 5, 6, Ex. F1 to Pl. Motion)  Cobbett then hypothesizes that, "in effect,

management's policy regarding overtime was 'don't ask, don't tell.'"  (*Id.* at ¶ 7)

  As shown in this testimony, Prescott's "look the other way" argument will necessarily

have to rest upon very individualized proof about what a particular supervisor knew or should

have known on a particular day given the surrounding circumstances.  These individual stories

cannot constitute a common unlawful practice, and they cannot be addressed with common

proof.[25]  Other courts have not hesitated to reject similar attempts by FLSA plaintiffs to establish a common unlawful practice for certification purposes on the basis of alleged supervisor awareness of off-the-clock work.  *See Adair*, 2008 WL 4224360, at *7-*8 ("Alleged FLSA violations stemming from the enforcement decisions of individual supervisors, rather than a company-wide policy or plan are not appropriate for collective treatment."); *Reed v. County of Orange*, No. SACV05-01103-CJC(ANx), 2010 WL 60922, at *15-*16 (C.D. Cal. Jan. 8, 2010) (decertifying because "whether supervisors or the [employer] as a whole had either actual or constructive knowledge that [employees] were working off-the-clock is an inherently individualize inquiry"); *Smith*, 2005 WL 5336571, at *2 (plaintiff's burden not met where no evidence that supervisors implemented *de facto* policy of permitting known off-the-clock work).

2.    The Ultimate Disposition of Claims Will Require Analysis of Circumstances That Are Unique to Each Putative Class Member.

It is well settled that where proof of liability depends on a showing of individualized circumstances affecting individual putative class members, as is the case here, certification is not appropriate.  *See, e.g, Basco*, 2004 WL 1497709, at *7 (corporate policy to keep wage costs low was insufficient proof of common policy where "this 'policy' and its effects are neither homogeneous nor lend themselves to collective inquiry.  The effects of the policy as alleged are anecdotal, that is to say particularized.").  In *Lawrence v. City of Philadelphia*, the court, in assessing a claim like Prescott's, noted that "the 'off-the-clock' claim does not involve regularly

---

[25] Prudential uses a lawful exception-based timekeeping system, paying DCMs based upon scheduled hours absent a report of deviation from the schedule.  *See* 29 C.F.R. § 516.2(c); U.S. Dep't of Labor FLSA Opinion Letter, 1998 WL 852676 (Feb. 6, 1998); N.J. Admin. Code § 12:56-4.3.  At points in her brief, Prescott seems to argue that Prudential "*could have*" known more about when DCMs where working.  Prudential, however, has no obligation to search out evidence that its employees are not complying with Prudential's policy requiring authorization for and reporting of extra hours worked.  *See Hertz v. Woodbury County, Iowa*, 566 F.3d 775, 782 (8th Cir. 2009); *Newton v. City of Henderson*, 47 F.3d 746, 748-50 (5th Cir. 1995); *Davis v. Food Lion*, 792 F.2d 1274, 1275-78 (4th Cir. 1986).

scheduled time that is worked by all members of the class.  Rather, each of the Plaintiffs may potentially claim that on any given day he or she arrived early or departed outside of their regularly scheduled hours and were not compensated for such.  The circumstances of those individual claims potentially vary too widely to conclude that in regard to their 'off-the-clock' claim, the Plaintiffs are similarly situated." *Lawrence v. City of Philadelphia*, No. 03-CV-4009, 2004 WL 945139, at *2 (E.D. Pa. Apr. 29, 2004).[26]

With respect to any individual putative class member and his or her claims, the primary issues will be (1) whether the DCM performed uncompensated work, and (2) whether Prudential is liable to that DCM for such work.  Both issues turn upon an examination of highly individualized facts and circumstances that are not susceptible to common proof and which could not realistically be tried in one proceeding.

To determine whether each putative class member performed uncompensated work, the Court and jury will have to examine the amount of time each individual allegedly worked on a daily and weekly basis over years, and whether the individual received compensation for all of the work he or she performed.  If the claims were tried collectively, the Court and jury would be required to decide thousands of alleged violations for potentially hundreds of claimants who have worked hundreds of days under a variety of supervisors and in varied work circumstances over as many as six years.  In order to prove liability as well as damages, just such a presentation

---

[26] *See also Diaz*, 2005 WL 2654270, at *5 ( "off the clock" claims too individualized and would "require an examination by the Court of when he was scheduled to work, when he actually worked, whether he was paid for such and….then, the Court would to have conduct the same inquiry as to each other class member."); *Salinas v. O'Reilly Auto., Inc.*, No. 3:04-CV-1861, 2005 WL 3783598, at *6 (N.D. Tex. Nov. 17, 2005) (insufficient evidence of company-wide unlawful policy or practice where evidence at most shows possible FLSA violations committed in a variety of different ways and "claims are flavored by particularized conduct occurring at the store/manager level").

would be required for each and every consent filer.[27]  As the testimony provided by the consent filers demonstrates, the nature of evidence that a fact-finder would be required to review is highly individualized.[28]  There is no common proof sufficient to support Plaintiff's class-wide claims and bring any measure of efficiency to a trial of this case as a collective action.  Standing alone, the highly individualized determinations the Court and jury would have to make regarding whether each putative class member actually worked uncompensated time demonstrate that Prescott and the putative class members are not similarly situated and therefore should not be certified as a class.

The fact that the jury will also need to decide whether Prudential is liable for each specific instance in which each DCM worked additional hours without compensation also precludes class certification.  The question of whether time worked by DCMs is compensable under the FLSA and Maine law depends upon whether Prudential "suffered or permitted" such work.  See 29 U.S.C. § 203(g) (defining "Employ" as including "to suffer or permit to work") ; 29 C.F.R. § 785.11 ("Work not requested but suffered or permitted is work time."); Ma. Rev. Stat. Ann. tit. 26, § 663(2); *Crook v. Russell*, 532 A.2d 1351, 1354 n.5 (Me. 1987).  The critical factual issue for determination by the Court and jury is whether Prudential knew or had reason to know that a particular DCM was performing uncompensated work on a particular day or during a particular week in a particular year.  *See* 29 C.F.R. § 785.11; *Sec'y of Labor v. E.R. Field, Inc.*,

---

[27] Certainly Prudential would have the right to call all consent filers on cross examination at a minimum.

[28] For example, Prescott claims that at the end of the day, she would tell her Team Manager that she was going home to work after she had been at the office all day.  (Prescott Dep. at 159) Lashua states that his desk was near his Team Lead, who would see him at his desk when she was leaving for the day when he was also supposed to be leaving.  (Lashua Dep. at 43)  Ordway claims that her Team Lead saw her eating at her desk and still working when he left at night, and that she told him that she was coming in on Saturdays.  (Ordway Dep. at 56-59)

495 F.2d 749, 751 (1st Cir. 1974) ("'The crucial question is not whether the work was voluntary but rather whether the [employee] was in fact performing services for the benefit of the employer with the knowledge and approval of the employer.'") (quoting *Republican Publ'g Co. v. Am. Newspaper Guild*, 172 F.2d 943, 945 (1st Cir. 1949)); *see also Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 287 (2d Cir. 2008) ("It is clear an employer's actual or imputed knowledge that an employee is working is a necessary condition to finding the employer suffers or permits that work."); *Davis v. Food Lion*, 792 F.2d 1274, 1276 (4th Cir. 1986) ("The words "suffer" and "permit" as used in [the FLSA] have been consistently interpreted to mean with the knowledge of the employer.").  By its very nature, such an inquiry will require an examination of what particular managers or supervisors knew or should have known regarding the hours individual DCMs worked on particular days in specific weeks over years of time.

Plaintiff attempts to ascribe knowledge of alleged uncompensated hours to all of management by suggesting, in essence, that each manger sits in a watchtower and observes DCMs at all times.  In fact, DCMs work in the office, from home, from the office and home, early schedules, and late schedules.  They work as part of 14 teams operating in two states, and obtain direction from 27 Team Leads, each assigned to but a small subset of the overall DCM world.  There is no evidence that Prudential maintains a policy or practice of visually observing its DCM workforce on a routine basis, nor could it.  DCMs work in places and at times such that, in many if not most instances, they could not be visually observed at all times.  Likewise, there is no evidence of any "electronic systems monitoring" to detect work time, as suggested by Plaintiff.  In short, the "my manager saw me" and "everybody knew" type of "evidence" relied upon by Plaintiff is conclusory, without foundation, and certainly not common to the entire DCM workforce.  The fact that this knowledge inquiry will require the Court and jury to review

thousands of individual situations spread over years further demonstrates why Prescott and the putative class members are not similarly situated and why this case is not appropriate for collective action certification.  *See Basco*, 2004 WL 1497709, at *7; *Lawrence*, 2004 WL 945139, at *2; *Diaz*, 2005 WL 2654270, at *5; *Salinas*, 2005 WL 3783598, at *6.

> 3.      Prescott's Attempt to Include Disability Claims Technicians in the Putative Class Further Undermines Her Bid for Collective Action Certification.

In addition to the highly individualized issues the Court and jury will have to address to resolve the off-the-clock claims of the DCMs, Prescott's motion for certification introduces an additional issue that makes this case even less appropriate for collective action treatment.  The putative class Prescott seeks to represent includes not only DCMs like herself, who are paid on a non-exempt basis by Prudential, but also DC Techs, who are paid on an exempt basis.  Because Prudential classifies and pays DC Techs as exempt employees, Prescott and the other DCMs cannot possibly be similarly situated to DC Techs.  In fact, courts routinely deny conditional certification where the prospective class contains some employees who are paid on an exempt basis and others who are paid as non-exempt employees.  *See, e.g. Mathews v. ALC Partner, Inc.*, No. 2:08-cv-10636, 2009 WL 2591497, at *5 (E.D. Mich. Aug. 24, 2009) ("exempt and non-exempt ALC employees are not 'similarly situated' within the meaning of the FLSA"); *Butler-Jones v. Sterling Casino Lines, L.P.*, No. 6:08CV01186ORL35DAB, 2008 WL 5274384, at *7 (M.D. Fla. Dec. 18, 2008) (proposed class is overbroad because exempt and non-exempt employees are not "substantially similar"); *Hunter v. Sprint Corp.*, 346 F. Supp. 2d 113, 119 (D.D.C. 2004) ("it cannot be said that the employees classified by Sprint as exempt are advancing 'similar claims' or seeking 'substantially the same form of relief' as the named [non-exempt] plaintiffs"); *Kinnett v. State of Kansas*, No. Civ. A. 90-4209-S, 1991 WL 241832, at *1 (D. Kan. Oct. 30, 1991) (non-exempt employee not similarly situated to exempt plaintiffs).

Here, Prescott's "pressure cooker" and "look the other way" arguments cannot possibly apply to DC Techs because they were treated in an entirely different way than DCMs for FLSA purposes.  In addition, Plaintiff's attempt to include DC Techs in the class further precludes a finding that the putative class members are similarly situated.  The inquiry required of the Court and jury regarding whether Prudential is liable to any DC Techs for unpaid overtime would require a very different factual and legal analysis than the inquiry with respect to each DCM.  To determine liability with respect to individual DC Techs, at least as a threshold matter, their exempt status under the FLSA will need to be decided by evaluating their job duties and responsibilities.[29]  For such individuals, issues of unauthorized off-the-clock work and knowledge or constructive knowledge by managers will play no, or at least a very different, role in the analysis.  That said, were the DC Techs included in the class and found to be non-exempt, resolution of their claims would still require a highly individualized Court and jury determination regarding the many factual issues discussed above in relation to DCMs.[30]

      D.    <u>Plaintiff Has Failed to Demonstrate Sufficient Interest From Putative Class Members</u>.

In addition to requiring a showing that putative class members are similarly situated, courts also require a showing of sufficient interest in joining a collective action, a point recognized by Prescott.  (Pl. Br. at 16-17, 21)  *See Dybach v. Fla. Dep't of Corr.*, 942 F.2d 1562, 1567-68 (11th Cir. 1991) (requiring a sufficient number of demonstrated potential opt-ins to justify collective action certification); *O'Donnell*, 429 F. Supp. 2d at 250 (interest required);

---

[29] Though Prudential maintains that DC Techs are properly treated as exempt employees, the exemption issue is not now before the Court for determination at the certification stage.

[30] In addition, DC Techs are not properly included in any class related to this lawsuit because the allegations of the Complaint are not broad enough to cover these employees.  Furthermore, Prescott, a DCM, cannot possibly provide adequate representation of DC Techs, and there is no other named plaintiff who could represent DC Techs in this action.

LEGAL02/31828095v15

*O'Donnell v. Robert Half Int'l, Inc.*, 534 F. Supp. 2d 173, 179 (D. Mass. 2008) (same);

*Silverman v. SmithKline Beecham Corp.*, No. CV 06-7272 DSF (CTx), 2007 WL 6344674, at *2

(C.D. Cal. Oct. 15, 2007) (calling for "more than a minimal number of prospective class

members [who] are interested in joining the suit"); *Sullivan v. Discount Plumbing*, No. Civ. A.

5:04-CV-144-C, 2004 WL 1836760, at *1 (N.D. Tex. Aug. 17, 2004).

Plaintiff has failed to demonstrate sufficient interest from putative class members to

justify proceeding as a collective action.  Here, despite the fact that this case has been pending

for over eight months, and despite newspaper and internet coverage,[31] the case has interested

only six other individuals – out of a potential class of more than 225 current and former

employees.  Prescott has not met her burden to demonstrate sufficient interest from putative class

members.  *See Pfohl*, 2004 WL 554834, at *10 (plaintiff "failed to come up with significant

numbers of allegedly similarly situated employees who are likely to assert similar claims,"

despite 13 consents); *see also West*, 2006 WL 1892527, at *6 (affidavits from six employees out

of a putative class of roughly 240 insufficient); *Silverman*, 2007 WL 6344674, at *2 (must show

"more than a minimal number*"* of prospective class members are interested in joining).

Prescott's failure in this regard becomes even more apparent when the group of consent

filers is broken down by job position and geography.  Notably, no DC Techs have filed consents

to join the lawsuit, and Prescott has not otherwise demonstrated *any* interest in the case from DC

Techs.  Furthermore, of the six consent filers in addition to Prescott, only one (Janie Reid) works

---

[31]     An article about the lawsuit was published in the Portland Press Herald.  (Riordan Decl. at ¶ 3 and Ex. A; *see also* < http://www.pressherald.com/archive/south-portlander-sues-prudential-alleging-unpaid-overtime_2009-12-25.html>)  Prescott's attorneys also published a classified notice on a New Jersey-based website seeking further participants in the lawsuit. (Riordan Decl. at ¶ 3 and Ex. B)

LEGAL02/31828095v15

for Prudential at its Roseland, New Jersey facility.  Prescott and the remaining consent filers, still

insufficient in number, all work or worked in Prudential's Portland, Maine office.

## IV.   CONCLUSION

The Court has before it a well-developed record sufficient to allow a hard look at the

conditional certification issue.  The record demonstrates that Plaintiff simply cannot carry her

burden and that conditional certification is not warranted.  To delay making this pronouncement

and put all to the enormous task and expense of notice and substantial additional discovery, only

later to reach the inevitable conclusion that common proof is missing and decertification is

required, serves neither the interests of the Court nor the parties.  For all of the reasons set forth

above, Prudential submits that Plaintiff's motion should be denied.[32]

---

[32] Prudential's Objections to Plaintiff's Proposed Notice are being filed under separate cover.
Further, if the Court were to authorize notice, Prudential submits that such notice should be
administered through a third party, rather than directly through Plaintiff's counsel.  *See, e.g., In
re RBC Dain Rauscher Overtime Litigation*, No. 06-3093 (JRT/FLN), 2010 WL 1324938, at *59
(D. Minn. Mar. 31, 2010); *Gandhi v. Dell Inc.*, No. 1:08-CV-248-JRN, 2009 WL 3427218, at *1
(W.D. Tex. Oct. 20, 2009); *Wren v. RGIS Inventory Specialists*, No. C-06-05778 JCS, 2007 WL
4532218, at *9 (N.D. Cal. Dec. 19, 2007).  If the Court were to require Prudential to produce
information regarding putative class members to Plaintiff's counsel, Prudential requests that the
Court limit Plaintiff's use of such information by (1) restricting her use of the disclosed
addresses for the sole purpose of sending notice of this litigation only; (2) restricting her
communications with potential opt-ins to issuance of an approved notice by United States mail,
on one occasion only; and (3) restricting her written communications with potential opt-in class
members to the approved notice. *See, e.g., Hipp v. Liberty Nat'l Life Insur. Co.*, 164 F.R.D. 574,
576 (M.D. Fla. 1996).

- 30 -

Dated:  April 16, 2010                      /s/ Robert P. Riordan

                                            Robert P. Riordan
                                            Brett E. Coburn
                                            Alston & Bird LLP
                                            1201 West Peachtree Street
                                            Atlanta, GA 30309-3424
                                            Tel: (404) 881-7000

                                            James R. Erwin
                                            Pierce Atwood LLP
                                            One Monument Square
                                            Portland, ME 04101
                                            jerwin@pierceatwood.com
                                            Tel:  (207) 791-1100

                                            Counsel for Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

MICHELLE PRESCOTT,                          )
                                            )
    on behalf of herself and                )
    others similarly situated,              )
                                            )
            Plaintiff,                       )          Civil Action No: 2:09-cv-00322-DBH
                                            )
    v.                                       )
                                            )
THE PRUDENTIAL INSURANCE                     )
COMPANY OF AMERICA,                          )
                                            )
            Defendant.                       )
_____)

CERTIFICATE OF SERVICE

I hereby certify that on April 16, 2010, I electronically filed the foregoing

DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR

CERTIFICATION OF COLLECTIVE ACTION AND TO AUTHORIZE AND FACILITATE

NOTICE TO ELIGIBLE OPT-INS with the Clerk of the Court using the CM/ECF system, which

will send notification of such filing to the following:

   Nicholas Bull
   Thompson, Bull, Furey, Ball & McColl, LLC, P.A.
   120 Exchange Street, Sixth Floor
   P.O. Box 447
   Portland, ME 04112-0447

   Timothy B. Fleming
   Wiggins, Childs, Quinn & Pantazis, PLLC
   2031 Florida Avenue, N.W., Suite 300
   Washington, DC 20009

   Dated:  April 16, 2010

                                            /s/ Robert P. Riordan
                                            Robert P. Riordan